Our final case for argument today is 25-1162, Incyte Corporation v. Sun Pharmaceutical. Good morning, Your Honor. May it please the Court. Paul Torsha on behalf of Sun Pharmaceuticals. The District Court preliminarily enjoined Sun from launching Lexelvi. Lexelvi is a branded, new, FDA-approved alopecia medication. And critically, Sun is the only party that can make it. This is not a generic case. This is not a case where Incyte has its own patented product on the market. Indeed, although Incyte says it has a patented product that it is developing, it is undisputed that that patented product will not be ready to be launched, if ever, until years. Is this case proceeding? Yes. I mean, I know we had the preliminary injunction that was like four months ago, five months ago, six months ago. Is there a trial date? Yeah, it's October, and that's a significant point. It's in October of 2026, two months before the patent expires. You mean a year from this October is when the trial date is? Yes. Yes, Your Honor. So the preliminary injunction clearly is in place until... Well, how long is until the injunction itself doesn't have an end date? Presumably it's... what? It's going to be in place until the patent expires, until there's a trial in the merits in late 2026. And so this is a case, again, where Incyte doesn't have its own patented product on the market. It's undisputed that they will not have their patented product on the market, if at all, ever, until years after the patent expires. And that's critical to two issues that we're going to address today. First, irreparable harm, and also it's relevant to written description, too. So before we get into those issues, I think it's important to focus on what Incyte has said. What they are urging the court to do is to simply defer to the trial judge on the abusive discretion standard. It's the entire thrust of their brief that this court should not look into the merits and simply defer. But this is a preliminary injunction. It's an extraordinary remedy. And this court reviews preliminary injunction orders with rigor, especially on irreparable harm. But it's not quite everything they said, because they also say in the alternative, forget about deference, and if you don't go with us on this one issue, you ought to flip the judge on the other issue. They do. They say that the district court got it wrong when it found that a pure stream of licensing revenue would be compensable by money damages. No court has ever reversed a district court on that basis. It is straight up compensable money damages. So their alternative ground for relief is baseless. Can I ask you, the district court labeled one through five, the reasons. Were there really five separate reasons presented why there's irreparable harm, and this was number five, the one that he ultimately settled on? Yes. So yeah, this was one, the fifth reason in their briefing was the last one. It was called the Head Start Theory. It was their last irreparable harm theory. They devoted about a page in their brief to it. And the theory was based on the proposition that Lixelvi, Sun's launch of Lixelvi today is going to do irreparable harm to an Insight product that does not exist today and will not exist until years after the patent expires. Indeed, this is a pre-phase one. So yeah, it's a super compelling argument. So don't take this as a hostile question, but it's a hostile question. You seem to be arguing for a line in the sand. If they don't have a product that is in fact FDA approved, they shouldn't be able to get a preliminary injunction. I'm really struggling with that. Is that really what you're asking for? Because you're seeming very reasonable at the podium, and I like everything you're saying, but I felt like your brief took a much more severe approach to what you thought we ought to make the law say. You don't need to make that decision. You don't need to say that there is no situation ever where you could have an unapproved product and have a PI based on it. We are not there. We are pre-phase one in an NDA. Didn't you kind of argue it in your brief, though? Well, yes, and you are.  Yes. All right, to make sure I'm not crazy. Well, you're not. So you swung for the fences in the brief, but you're saying you'll take a base hit. Well, I mean, it's true. It is true that there's no case that even grants this kind of remedy in a generic that has tentative approval that is about to be launched. In other words, that isn't this case, but it is in fact. Yeah, but there's no case that denied it under those circumstances. Yes, that's true. I mean, come on. Like, the incentives can't possibly be that if you don't have FDA approval, they can't get it. What if they've got 20 years, 19 years left and 364 days in their patent term, and they're, by all accounts, past stage three trials. They're on the eve of FDA approval, and you're going to launch some generic. It comes out at seven cents a pill and undermine the brand's ability to come on at monopoly pricing. I mean, clearly, we cannot have a rule that would say, sorry, Charlie, no Head Start matters in that case. The court does not need to enter such a rule. You asked me to enter that rule. You asked for that rule, and I'm just pointing out that that was a bad ask. So the thrust of our brief is that on this record, there can't be a reparable harm. I know, and I agree with you. You won. What else you got? Can I ask you this? If we agree with you on irreparable harm that they lose and the injunction can't be based on that, but we disagree with you on the written description stuff and think the district court got that right, what do we do? Can we just reverse the injunction because irreparable harm is so critical, or do we have to send it back for the district court to look at the four factors again? No, I mean, there's many cases that say that irreparable harm alone is enough, and you can simply reverse and revand. And this is an unusual case where the judge considered alternative things. She didn't just say, well, I don't have to consider their other irreparable harm theories because I'm going to settle on Head Start. She went through and rejected their other arguments with respect to irreparable harm. That's right. Judging those is a he, but, yes, that's true. And so we have a very small issue left on irreparable harm. We know that it's fatally deficient because it involves a product that's not just unproved, but it's pre-Phase I. It's never been tested in humans. Not even close. Trust me, I know the facts. You don't have to beat me with them. I got them. I swear to God I got your facts. You seem incredulous, but I'm actually with you 100%. But to address Judge Hughes, your point on written description, if the court doesn't agree with some written description, no, it doesn't need to remand for further proceedings. The lack of showing irreparable harm is more than sufficient to... Do we even have to address your arguments on written description if we agree with you on irreparable harm? So, not to be cute, but if you like our argument on written description... No, no, no, no. I don't want to hear that you want us to address it because it might give you ammunition in the underlying litigation because I'm not going to do that. The district court judge can make the determination on that, and we can review that later. Oh, and you wouldn't likely have me on that, so you probably want to steer clear of that one. Yeah, so I think we want to steer clear of that point, Roger. I think that the point on irreparable harm is sufficient for a reversal and remand of this preliminary injunction. It's unprecedented, and it is clearly speculative. The other side has made some arguments that, apart from the launch, that the district court decided that there was an investment value, thought that that was worth addressing. That actually wasn't a finding. There was no independent finding of harm to investment. No federal circuit court has ever found that an independent harm to investment, even if the court did make that finding, would be sufficient for irreparable harm. So, yes, on that basis, there should be a reversal and remand on the issue of irreparable harm, and as Your Honor says, there's no need for this court to address the 112 issues. In that opinion, you can just reverse on that basis. You can save the rest of the time for rebuttal. I can save the rest of the time for rebuttal. Mr. Feldstein? I'm here. You want your iPad?  Oh. Thank you, sir. District Court, Mark Feldstein on behalf of Capelli Insight. I'd like to address a comment made by counsel just now, that there was no separate finding of irreparable harm due to effect on investment value. In fact, the finding was made twice and was ignored by Sun largely in their briefs. There's a finding on appendix page 43 that there was investment harm. There's a finding on page 49 in the balance of the hardships that reinforces that irreparable harm. What the judge found on page 43 is Sun's premature entrance into the AA market diminishes the value of plaintiff's investments in a topical AA product. What the court then again found on appendix page 49 is that additionally Insight would lose substantial investment and continued investment in developing a treatment setting the same underlying evidence. That's Sun's in the public interest. That's correct, Your Honor. And it's citing back to the same evidence that the court cited to you on page 44. Here's my problem with all that. My problem with all that is it all hinges on the primary factual inaccuracy that this district court judge made on page 41, which really tracks so clearly with what your opposing counsel said. I want you to go to page 41 of the district court's opinion. And on this page, it says the nexus is straightforward. But for Sun's, and I'm going to try really hard never to say anything confidential. So if I start to, just like wave your hands or stop me or something. But it says, but for Sun's, I don't know how to pronounce the product, Insight's 355 patent would provide the ability to bring a duro-ruxolibanab AA treatment first to market. That is false. That is clearly erroneous. That is clearly erroneous because every document that you provided in this case demonstrates that you can't be on the market. You're not even going to seek FDA approval until years after your patent expires. They can flood the market, be on the market for years. So this fact finding is clearly erroneous. There's nothing in this record that supports it. And so everything she found thereafter, including the hit you're going to take in terms of investments in your product, was all premised on this fundamentally inaccurate fact finding. I would respectfully disagree, Your Honor. The finding, the way we read the finding in context, is the court understood that during the lifetime of the 335 patent, Insight could protect it. Because elsewhere the court found it, it may take me a second to find it, elsewhere the court recognized- She says you would be first to market. First to market. That is inaccurate. By your own documents. The court elsewhere recognized expressly that there's a time where we would be coming to market later. And the court's opinion is not premised on Insight coming to market first. That one statement you raised, I recognize what it says. And the problem is that, as the court found earlier, that what you're giving Sun, you're giving an advance head start of two years onto the market to entrench itself. And that's something that Sun embraces as their business strategy, their entire business strategy. And this is, again, what they ignore in their briefing. They ignore their own undisputed business strategy. I think the head start thing is an economically sound principle. In a circumstance where you would actually be able to enter the market prior to the patent's expiration and therefore be first. And I think with this product, you've got such a lot of stuff in this record that really convincingly establishes a brand devotion or loyalty. Somebody starts using a product, whoever it is, they're not going to switch. I get it. I was somebody who had air loss, and I start using a product, and the label says, if you stop using this product, all your hair's going to fall out. I would not stop using that product ever. For the rest of my life, I'd keep using that product. And I understand why people would do that. So I get your head start theory, no pun intended. I get the head start theory, the economic principles behind it. But the problem is it doesn't apply here because they're going to, by virtue of your own documents, be able to launch years before you will be in market once your patent expires. So they're going to get that head start no matter what. Wait, I know it's long. I swear I'll give you all the time you want. What you needed to prove was there was some difference between the number of years that they launch now and the number of years they would launch, accepting as true your own representations about when you will seek FDA approval and that there's some serious economic difference there. You didn't even attempt to do that. You threw out this cursory, in a paragraph, head start concept, a concept I agree with, but doesn't seem to apply here, and you haven't backed it up. So Sun, in fact, makes that case for us that the early two years are substantial and affect the long term. But they're going to get the early two years no matter what. Your product, by your own documents, won't be anywhere near market when your patent expires. They're going to get their two years. They're getting an additional two years. So if you're in a race with somebody and they get a 20-minute head start versus a 40-minute head start, it's a difference on how far behind you are and how far you have to catch up. They're getting the extra 20 minutes of head start. That's not just a market concept that we accept as a given. No, it depends. You didn't make that case. But there's no case made that if they have two years head start or four years head start rather than two years, you're going to be irreparably harmed by that. You've got to make it in a pretty non-speculative way. There's an assumption, I guess, that that's likely to be the case. But I don't get that they're there. There's underlying evidence that the early head start adds additional time that is going to make it harder for us to catch up. Some of this, as I said, comes from Sun Directly. Their Nelson Declaration, which is Appendix 9949, they go into detail about how these early two years are critical to the business justification for going forward. It affects the business value of the investment. It affects the business value of the product. In reply— But as the Chief said, they're getting the early two years. We're talking now about whether we add more years to the initial head start that they will get in any event. It's the time period now. The market is growing. It's a nascent market, as the Court found, and it's not disputed by the other side. It's a growing market. Locking in these patients during this early phase will block them, potentially, from Insight ever getting them. And so, yes, the 335 patent expires before our product is expected to make it to the market. But by Sun having a 40-minute head start instead of a 20-minute head start, they're locking in additional customers during the early time period. What they say in their recovery at pages 14 to 15 is they recognize this very fact that the market dynamics can underlie the very business justification for bringing a product to market. And so if they continue to flood the market for an additional two years, that undermines the business justification. It goes to the value of the investment, which the Court found as a separate finding in Appendix 43, and then, as I said, reiterated it at 49, and it goes to the long-term harm to when Insight's product comes to the market. It's permanently lost market share, potentially, to Sun's product. I have a factual question for you. You have two different appendices, charts, tables, timelines, and they're slightly different, and I don't know, is one of them an updated one? And I'm going to point you in particular, because I just want to make sure we work with the correct numbers. So you have a timeline at page JA10575. And then you have almost the identical timeline at 10588. And I guess I want to know which of these timelines is the more relevant one for purposes of when you are likely to seek FDA approval and obtain FDA approval. The NDA submission is the same quarter in both. No. No, actually, it's two years apart. Look on 10588. I apologize. The 110575 is the correct timeline to be looking at, then. Why would I know that? Why are these both in this record, then? These are both produced by your client. One of them has the FDA pursuit years after the other. Which one am I supposed to rely on? Which one is later in time? Give me something in the record other than just your assertion here. I'll have to find it. I don't think there was a dispute that the date that is shown on appendix 10575 is the date that the witness, Dr. Flannelly, testified to his declaration as to when the NDA would be submitted. And just out of curiosity, what's 10588? Do you think this is an earlier timeline or something? I'm just trying to understand the difference. Because I'll tell you, the one at 10588 has more specificity in it. Like if you look under the portion of the timeline around the 25-26 time period, they've got some details that aren't present in this 10575 one. The 10588 has more information in more detailed fashion, and I tended to think when I looked at the two it was the later in time and therefore more likely to be correct one. But I'd like to know from you if that's true. Yeah, I don't have an answer for you right now on 10588. I am confident that the timeline on the NDA submission on 10575 is what Dr. Flannelly testified to in declaration. And where it says ND, that's NDA, and the A is blacked out, right?  So, again, the harm to the investment is an independent harm that happens now. It's an immediate harm that the court found that Sun's response to is to ignore and pretend it didn't happen. It's there. It's a separate finding. There are two findings for the reputable harm. One is to the immediate investment value. One is to long-term market share. Both will be affected by Sun having extra time in the market to lock in customers. The illuminate point is an additional point. The illuminate is already on the market. And what Sun, again, confirms and helps us in their reply, they confirm that what the court did there was look at the short-term damaging period. And I think it's Appendix 36 where the court's opinion is on that. And the court was looking only through the expiration of the 335 patent for damages, a relatively short time in the scheme of things. But the royalty source from illuminate is from a different patent, is a different source. It continues. And the head-start harm that the court found that will have long-term impact by Sun locking in customers long-term equally affects the long-term harm to the illuminate and the royalties from that, that the court didn't apply its own findings back. It cut off its harm at the idea of the 335 expiration, which was not right because, as we argued below, it was a long-term harm. And that long-term head-start harm affects illuminate equally. If the court found that it will affect illuminate pricing, for example, going forward, it will affect market share going forward. Okay. Anything further? No. Okay. Thank you, counsel.  Your Honors, briefly, I thought I'd start by addressing the investment point, which we alluded to earlier. There wasn't a separate finding of an investment. In fact, there wasn't even an articulation below about what their present investment was in this product. What they gave is a number, and you can see it on appendix. The district court recites it on appendix 43. It's a number of what their projected investment was. I can't say what it is here. It's not a large number. There is a much smaller number that is what their present investment was. That was actually alluded to in a parallel appeal. Involving this case. But all of those numbers are premised on the head-start argument anyway because that very paragraph begins with the words, son's premature entrance into the AA market. And so if you're going to get a head-start either way, what do those numbers matter? Correct. I mean, especially the kind of head-start we're talking about. It's not a day. You know, it's not a week. It's a significant chunk of time. Yes. You ready to go to market? Yes. So, and yes, Your Honor. Like you're geared up and ready to go? Yes, Your Honor. Okay. And I guess the last issue I'd like to address relates to the point about, yes, Sun believes that a reversal on this issue is the appropriate. For that reason, Sun is eager to release this product to patients. And as Ron or Judge Hughes has noted, the only issue that needs to be addressed is where it will go. I don't have anything further. Excellent. Thank all counsel. The case is taken under submission.